**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Christopher Romano, et al.

    v.                                Civil No. 15-cv-384-AJ
                                            Opinion No. 2017 DNH 124

Site Acquisitions, LLC


**MEMORANDUM AND ORDER**

Christopher Romano, Michael Petros, Shane Bruneau, Israel Carey, and Bradley Matthews (collectively the plaintiffs) bring this action against Site Acquisitions, LLC ("SAI"), alleging that SAI improperly withheld incentive bonuses that were due to the plaintiffs in 2013.  SAI moves for summary judgment (doc. no. 38), and the plaintiffs object (doc. no. 41).[1]  The court held a hearing on June 5, 2017.  For the reasons that follow, SAI's motion is granted in part and denied in part.

**Summary Judgment Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir.

---

[1] SAI filed a reply to the plaintiffs' objection.  See doc. no. 44.

2016).  "An issue is 'genuine' if it can be resolved in favor of either party, and a fact is 'material' if it has the potential of affecting the outcome of the case."  Xiaoyan Tang, 821 F.3d at 215 (internal quotation marks and citations omitted).  At the summary judgment stage, the court "view[s] the facts in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in the nonmovant's favor . . . ."  Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016) (citation and quotation marks omitted).  The court will not, however, credit "conclusory allegations, improbable inferences, and unsupported speculation."  Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation and quotation marks omitted) cert. denied, 137 S. Ct. 627 (2017).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence of any genuine issue of material fact."  Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016).  Once the moving party makes the required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'"  Id. (citation omitted).  "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence

must be more than 'merely colorable.'"  Id. (citations omitted).
The nonmoving party's failure to make the requisite showing
"entitles the moving party to summary judgment."  Id.

### Background

     SAI, a Massachusetts corporation, provides "turf vendor"
services to telecommunications companies.  Doc. no. 38-5 at 3;
Affidavit of Israel Carey (doc. no. 38-2) at 50.[2]  In this
capacity, SAI is responsible for the "siting, modification, and
installation of wireless communications facilities . . . on
certain cell towers or structures."  Declaration of Shawn
Hancock (doc. no. 39) ¶ 5.  During all periods relevant to this
case, SAI served as a turf vendor for AT&T Mobility LLC
("AT&T").  See Hancock Dec. ¶ 6-7.  This relationship was
memorialized in a "Turf Program Agreement," which the parties
entered into on December 16, 2011.  Id.; see also doc. no. 38-5;
doc. no. 41-13.

     The Turf Program Agreement was in effect in 2013, the year
most relevant to the present case.  Hancock Dec. ¶ 6.  During
that year, SAI was responsible for modifying and installing AT&T
facilities, including cell towers.  Id. ¶ 8.  To accomplish this

---

[2] The excerpts of deposition transcripts provided to the
court by SAI contain four numbered transcript pages per document
page.  All citations to depositions will be to the transcript
page.

work, SAI employed several of its own "tower crews," id., whose
responsibilities included working on the ground and up on the
towers at the tower sites, see, e.g., Deposition of Israel Carey
(doc. no. 38-2) at 52.  SAI also had dozens of additional tower
crews at its disposal through subcontracts with tower companies.
Hancock Dec. ¶ 8.

     In March of 2013, AT&T informed its turf vendors, including
SAI, that it was initiating an incentive program ("incentive
program" or "incentive bonus program").  Id. ¶ 10; see also doc.
no. 38-6.  This program was designed to help turf vendors
"obtain[] tower crew resources."  Hancock Dec. ¶ 6; see also
doc. no. 41-4, at 1.  In early April, AT&T provided SAI with two
policies — VCC Policy 130325 (the "325 policy") and VCC Policy
130327 (the "327 policy") — detailing the incentive program.
Doc. no. 41-3; doc no. 41-4.  At some point thereafter, AT&T
provided SAI with two Power Point presentations related to the
incentive program.  Doc. no. 41-5; doc. no. 41-6.

     Under the incentive program, AT&T would award a series of
bonuses so long as certain conditions were met. Doc. no. 41-4 at
2.  The conditions, known as "drivers," related generally to the
quality and speed of work on the towers sites.  Id.  Bonuses
ranged from $500 to $8,000 per driver per site, id., with a

total bonus amount of $13,000 available per site.[3]

There is no dispute in the record that Shawn Hancock, SAI's director of construction, met with SAI's tower crews in May of 2013 to discuss the incentive bonus program ("May 2013 meeting").  Nor is there any dispute that Bruneau, Petros, Matthews, and Carey were present at that meeting.  These facts are attested throughout the record, including in Bruneau, Petros, Matthews, and Carey's deposition testimony and affidavits, and Hancock's declaration.[4]

The parties do, however, dispute what specifically was said at the May 2013 meeting, with Hancock's recollection differing considerably from the recollections of Bruneau, Petros, Matthews, and Carey.  As Bruneau, Petros, Matthews, and Carey are nonmoving parties, the court must credit their accounts for the purposes of the present discussion.  See Garmon, 844 F.3d at

---

[3] The driver bonuses in the 327 policy, when added together, total $14,667.  See doc. no. 41-4 at 2.  The parties do not appear to dispute, however, that the maximum total bonus available per site was $13,000.  The court will accordingly assume the same for the purposes of this order.

[4] See Hancock Dec. ¶ 16; Carey Dep. beginning at 69; Deposition of Shane Bruneau (doc. no. 38-3) beginning at 53; Deposition of Michael Petros (doc. no. 38-7) beginning at 36; Deposition of Bradley Matthews (doc. no. 38-14) beginning at 56; Carey Aff. (doc. no. 41-7) ¶ 3; Affidavit of Bradley Matthews (doc. no. 41-9) ¶ 3; Affidavit of Shane Bruneau (doc. no. 41-10) ¶ 3; Affidavit of Michael Petros (doc. no. 41-11) ¶ 3.

312.[5]

The May 2013 meeting immediately followed a regularly-
scheduled safety meeting.  Hancock entered at the end of the
safety meeting and, according to two of the plaintiffs, waited
for the electricians leave.  Carey Dep. at 69, 72; Matthews Dep.
at 62.  Jason Rossi, an SAI construction manager who had
presided over the safety meeting, remained in the room and was
present at the May 2013 meeting.

Hancock informed the tower crews that AT&T had initiated an
incentive bonus program.  This was the first time any of the
plaintiffs had heard about this program.  Hancock indicated that
AT&T would pay up to $13,000.00 in bonuses per tower site.  He
indicated that the full amount of any given bonus would be
generally determined by the speed and quality of the work done
on that site.  According to two of the plaintiffs, Hancock
and/or Rossi stated that the bonuses would be "huge" or
"significant."  See Carey Dep. at 79; Bruneau Dep. at 55.

Hancock indicated that the bonuses would go directly to the
tower crews and that the bonuses would be paid out at the end of

---

[5] These accounts are generally consistent, and to the extent
they are, the court relies on the deposition excerpts and
affidavits generally without citing to any particular document.
The court will cite to specific deposition excerpts or
affidavits to the extent they differ materially from the other
accounts or contain information not otherwise included in the
other accounts.

the year.[6]  Three plaintiffs recall Hancock or Rossi stating that
that Carey, a salaried employee, would also be entitled to the
bonuses because he worked on the towers.  Carey Dep. at 69;
Bruneau Dep. at 126; Petros Dep. at 45.  Two plaintiffs
specifically recall Hancock instructing the tower crews not to
tell other SAI employees, including electricians, about the
bonuses, as those employees were not part of the incentive bonus
program.  See, e.g., Bruneau Dep. at 53, 70; Petros Dep. at 37.
Three plaintiffs testified during their depositions that they
were "excited" by the news of the incentive program due to the
amount of bonus money they believed they were going to receive.
See Carey Dep. at 99; Petros Dep. at 30-40; Matthews Dep. at 70.

Romano was not present at the May 2013 meeting, as he had
not yet been hired by SAI.  See Deposition of Christopher Romano
(doc. no. 38-13) at 73-75; Affidavit of Christopher Romano (doc.
no. 41-8) ¶ 6.  His understanding of the incentive bonus program
developed over several months based on four separate events.
See Romano Dep. at 125-29.  Romano was initially informed that
an incentive program existed in late May of 2013, during his

---

[6] The accounts differ as to how these bonuses would be paid
out, with some plaintiffs understanding that the bonuses would
be divided among the tower crews who worked on each tower, and
others understanding that the bonuses would be pooled and
divided equally among all of the tower crews. Compare, e.g.,
Bruneau Aff. ¶ 3 with Carey Aff. ¶ 3.

7

interview with Rossi.  Romano Aff. ¶ 3.  Rossi indicated that
vendors appreciated the work that tower crew members do and that
he knew of a vendor that was offering incentive rewards to tower
crews, but did not indicate which vendor it was or provide any
additional details.  Romano Dep. at 39-40; Romano Aff. ¶ 3, 5.
Romano later asked Hancock about the incentive program, but was
not provided any additional information.  Romano Dep. at 126-27.
After that conversation — on or around July 4, 2013 — Carey
informed Romano that AT&T was the vendor.  Id. at 127-28; Romano
Aff. ¶ 7.  Carey later indicated that the bonus money would be
evenly distributed between the tower crew members.  Romano Dep.
at 127-28.  Romano did not learn of the total amount AT&T might
pay for each tower site until after his employment with SAI
ended.  Romano Aff. ¶ 10

Following the May 2013 meeting, the incentive bonuses were
a popular topic of conversation among the tower crew members.
Carey Dep. at 109; Bruneau Dep. at 67-70; Matthews Dep. at 77-
78.  At some point in the late spring or early summer of 2013,
the plaintiffs learned that incentive bonuses were being
included in the regular paychecks of tower crews working on AT&T
tower sites for SAI subcontractors.  Bruneau Dep. at 67; Petros
Dep. at 83.  As a result, tower crew members started asking
about the incentive bonuses during regular Monday safety

meetings with SAI officials.  Bruneau Dep. at 67–71; see also Matthews Dep. at 77–79.  When asked about the bonuses, SAI officials responded with statements such as, "it's coming and you're going to get what you get," Bruneau Dep. at 72, and "we're working on something," Romano Dep. at 128.

At their depositions, Carey, Bruneau, Petros, and Matthews each testified that they worked harder after learning of the incentive bonus program.  For instance, Carey stated that the tower crews "worked longer hours to get more sites done during the week" and "tried [their] hardest to get the most out of the sites that [they] could."  Carey Dep. at 100.  Bruneau similarly testified that "with the incentive, there was a lot more effort . . . . [T]here was that carrot . . . dangling in front of you.  So everybody's going to run a lot faster and a lot harder to try to get that carrot."  Bruneau Dep. at 45.  Petros stated that he believed Hancock "was giving [the tower crews] some kind of incentive to work longer hours and weekends" and that he worked long hours and weekends at least in part because of the incentive program.  Petros Dep. at 88, 90.  Matthews testified that he believed the tower crews "hustled" a little more as a result of the program.  Matthews Dep. at 53.  Additionally, Bruneau stated that he continued to work at SAI at least in part due what Hancock said during the May 2013 meeting.

Bruneau Dep. at 132.

Each of the plaintiffs received bonuses from SAI in December of 2013.  Bruneau received a bonus of $4,400.  Bruneau Dep. at 72.  Carey, Petros, and Matthews each received bonuses of $4,100.  Carey Dep. at 110-11; Petros Dep. at 48; Matthews Dep. at 47.  Romano received a bonus of $3,000.  Romano Dep. at 115.  SAI typically paid its employees discretionary "Christmas" bonuses at the end of each year.  Though the bonuses the plaintiffs received in 2013 were larger than the "Christmas" bonuses they were awarded in other years, they were less than what the plaintiffs believed they would receive in light of the incentive bonus program.  Carey Dep. at 111; Bruneau Dep. at 73; Petros Dep. at 50; Matthews Aff. ¶ 7; Romano Dep. at 115-16.  Several plaintiffs believe that their 2013 bonuses were their regular "Christmas" bonuses and that they never received any of the incentive bonus money paid by AT&T.  See Carey Aff. ¶ 9; Bruneau Aff. ¶ 9; Matthews Aff. ¶ 7; Romano Aff. ¶ 9.

There is no dispute that SAI received payments from AT&T under the incentive bonus program.  Hancock Dec. ¶ 20.  Some of that money was passed through to the tower companies with which it subcontracted.  Id.  SAI allocated a portion of the payments it retained to its "discretionary annual bonus program," which provided bonuses to tower crew members (including the

plaintiffs), construction managers, and other construction department employees.  Id. ¶ 21.  SAI also used some of the incentive bonus payments to purchase equipment and to pay taxes and other expenses incurred as a result of the incentive bonus program.  Id.

## Discussion

The plaintiffs allege that SAI unlawfully retained some or all of the incentive bonus money paid by AT&T for the work they performed on AT&T towers during 2013.  Their third amended complaint is comprised of five counts.  All five plaintiffs bring counts of breach of contract under a third-party beneficiary theory ("Count I"); breach of contract under a promissory estoppel theory ("Count II"); and unjust enrichment ("Count III").  All of the plaintiffs other than Carey also bring counts for failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(3)(c) ("Count IV") and failure to pay all wages due in violation of N.H. Rev Stat. Ann. ("RSA") § 275:44 ("Count V").  SAI moves for summary judgment on all counts.

## I.   Third-Party Beneficiary

The New Hampshire Supreme Court ("NHSC") has recognized the third-party beneficiary doctrine as "an exception to the general rule that a non-party to a contract has no remedy for breach of

11

contract." Brooks v. Trustees of Dartmouth Coll., 161 N.H. 685, 697 (2011) (citation omitted).  "Third-party beneficiaries are nonparties to a contract who are nevertheless allowed to sue to enforce it because the parties intended them to have that right." Id. (citation omitted).

Under New Hampshire law, a third-party beneficiary relationship exists if:

> (1) the contract calls for a performance by the promisor, which will satisfy some obligation owed by the promisee to the third party; or (2) the contract is so expressed as to give the promisor reason to know that a benefit to a third party is contemplated by the promisee as one of the motivating causes of his making the contract.

Id. (citation omitted).  In the latter scenario, "[a] benefit to a third party is a 'motivating cause' of entering into a contract only where the promisee intends to give the beneficiary the benefit of the promised performance." Id. at 697–98 (citation omitted).

"The fact that a third party is to receive some benefit through the performance of the contract does not make that party a third-party beneficiary of the contract." Id. at 698 (citation omitted).  This is true even when that benefit is pecuniary in nature.  See Numerica Sav. Bank, F.S.B. v. Mountain Lodge Inn, Corp., 134 N.H. 505, 512 (citation omitted).  In order for a third party to have standing to sue under a contract, the contract must "directly benefit the would-be

beneficiary . . . ."  Brooks, 161 N.H. at 698.  To this end, the
NHSC has adopted Restatement (Second) of Contracts § 302(1)(b),
requiring that "the promise and its circumstantial setting must
evince an intent on the part of the promisee to confer the
benefit of promised performance on the would-be beneficiary."
Id. (citation omitted).  "In such cases, if the beneficiary
would be reasonable in relying on the promise as manifesting an
intention to confer a right on him to enforce the promise, he is
an intended beneficiary."  Id. (citations omitted).

SAI contends that the plaintiffs were never the intended
beneficiaries of any agreement SAI entered into with AT&T with
respect to the incentive bonuses.  In support of this argument,
SAI points to the original Turf Program Agreement between SAI
and AT&T, as well as the 325 and 327 policies.  SAI contends
that these documents, which it seemingly concedes comprise the
operative agreement between SAI and AT&T with respect to the
incentive bonuses,[7] fail by their plain terms to confer third-
party beneficiary status upon the plaintiffs.

SAI has met its burden of demonstrating the absence of any
genuine issue of material fact with respect to the plaintiffs'
third-party beneficiary claim.  Neither of the excerpts of the

_____

[7] In its motion, SAI relies on the Turf Program Agreement.
At the hearing, however, SAI conceded that it accepted the terms
of the 325 and 327 policies through its performance.

13

Turf Bonus Agreement provided by the parties demonstrates an intention to confer a right upon the plaintiffs to enforce the terms of the incentive bonus program.  See doc. no. 38-5; doc. no. 41-13.  Indeed, neither excerpt makes any mention of the incentive bonus program at all.  And while the 325 and 327 policies do clearly speak to the incentive bonus program, neither contains language sufficiently definite to confer a direct, enforceable benefit on the plaintiffs. See doc. no. 41-3; doc. no. 41-4.  For instance, the policies are silent as to whether the tower crews were entitled to any amounts paid by AT&T under the incentive bonus program.  They are similarly silent as to whether the tower crews possessed the right to enforce the terms of the incentive bonus program.  Thus, assuming these documents comprise the full scope of the incentive bonus program agreement, SAI has sufficiently demonstrated a lack of any language evincing an intent to confer an exclusive right on the plaintiffs to the benefits under that program.

In response, the plaintiffs rely on the two Power Point presentations related to the incentive bonus program.  See doc. no. 41-5; doc. no. 41-6.[8]  Yet the plaintiffs identify no

---

[8] The plaintiffs rely in particular on language in one of these presentations stating that the incentive bonus program was

evidence suggesting that these presentations were incorporated into the incentive bonus agreement between SAI and AT&T, and provide no coherent legal argument to support such a conclusion. Instead, the plaintiffs appear to ask the court to infer the enforceability of the terms of these presentations based on their very existence in the record.  To this end, the plaintiffs repeatedly state, without further elaboration, that these presentations constitute "relevant contract documents."  These conclusory statements are insufficient to satisfy the plaintiffs' burden in the face of SAI's showing of an absence of any genuine issue of material fact in the record with respect to this claim.  See Flovac, 817 F.3d at 853.  As such, SAI is entitled to summary judgment on the plaintiffs' third-party beneficiary claim.

Accordingly, SAI's motion for summary judgment is granted as to the plaintiffs' third-party beneficiary claim.

## II.  **Promissory Estoppel**

Promissory estoppel is a theory "under which a promise reasonably understood as intended to induce action is enforceable by one who relies upon it to his detriment or to the benefit of the promisor."  Panto v. Moore Bus. Forms, Inc., 130

---

"[i]ntended to be a **direct pass through** to the tower crews themselves."  Doc. no. 41-5, at 3 (emphasis in original).

N.H. 730, 738 (1988).  The NHSC "has adopted the definition of
promissory estoppel from Section 90 of the Restatement (Second)
of Contracts." Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st
Cir. 2012) (citing Marbucco Corp. v. City of Manchester, 137
N.H. 629, 632 (1993)).  Section 90 defines promissory estoppel
as follows:

> A promise which the promisor should reasonably expect to
> induce action or forbearance on the part of the promisee or
> a third person and which does induce such action or
> forbearance is binding if injustice can be avoided only by
> enforcement of the promise. The remedy granted for breach
> may be limited as justice requires.

Restatement (Second) of Contracts § 90 (1981).

SAI makes three arguments as to why it is entitled to
summary judgment on the plaintiffs' promissory estoppel claim.
First, SAI argues that there are no facts in the record from
which a reasonable trier of fact could conclude that SAI ever
made a sufficiently definite promise to the plaintiffs with
respect to the incentive bonus program.  Next, SAI argues that
even if there is a genuine dispute as to the definiteness of
Hancock's statements during the May 2013 meeting, SAI's
subsequent statements to the plaintiffs made it unreasonable for
them to rely upon that initial promise.  Finally, SAI contends
that there is no evidence in the record demonstrating that
Hancock's statements resulted in any action or forbearance on
the part of the plaintiffs.

16

The court concludes that there is a genuine dispute of material fact in the record that precludes summary judgment against Matthews, Bruneau, Petros, and Carey on their promissory estoppel claims.  Based on the evidence in the record, a trier of fact could reasonably conclude, among other things, as follows: (1) that each of these plaintiffs was present for the May 2013 meeting with Hancock; (2) that each learned of the incentive bonus program from Hancock for the first time at that meeting; (3) that Hancock and/or Rossi stated that the bonuses could potentially be "huge" or "substantial; (4) that Hancock stated that the incentive bonuses were being provided by AT&T; (5) that Hancock stated that AT&T would award bonuses of up to $13,000 per site, assuming certain conditions were met; (6) that Hancock stated that the bonuses would be paid at the end of the year; and (7) that Hancock stated that these bonuses were only available to the tower crews.  A reasonable jury could conclude, based on these facts, that SAI made a promise to those plaintiffs present at the May 2013 meeting with respect to the incentive bonuses that could reasonably have been expected to induce action or forbearance on the part of those plaintiffs.

SAI relies on discrepancies between each plaintiff's specific recollection of the May 2013 meeting in an attempt to demonstrate that Hancock's statements could not have been

17

sufficiently definite as a matter of law.  This argument is
unavailing, because it requires the court to make weight and/or
credibility determinations with respect to the plaintiffs'
statements.  Such determinations are beyond the scope of the
court's review at the summary judgment stage.  See, e.g., Hicks
v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014) (when determining
whether summary judgment is appropriate, a court "may neither
evaluate the credibility of witnesses nor weigh the evidence").

SAI further contends that Hancock's statements did not
constitute a sufficiently definite promise because Hancock did
not inform the plaintiffs precisely how much bonus money they
would receive.  The court declines to conclude now as a matter
of law that a promissory estoppel claim cannot sound when the
amount owed under the promise is conditioned upon the quality
and/or quantity of the promisee's performance.  Here, it was
impossible for the plaintiffs to know at the time of the May
2013 meeting either how much they would receive per tower or how
many towers they would work on.  But crediting the statements in
their affidavits and depositions, these plaintiffs were informed
that AT&T would award bonuses of up to $13,000 per site and that
this money was only available to the tower crews.  This is
enough, at present, for their promissory estoppel claim to
survive.

The court is also unpersuaded by SAI's argument with respect to subsequent statements made to the plaintiffs regarding the incentive bonuses.  SAI argues that its officials equivocated when asked about the incentive bonus program after the May 2013 meeting.  SAI points to statements such as "it's coming and you're going to get what you get" and "we're working on something" in support of this argument.  Yet, as the plaintiffs noted at the hearing, a jury could reasonably conclude that any uncertainty expressed in these statements related to how much AT&T would pay per tower and how many towers the crews would complete, rather than whether (and, if so, how much) SAI would allot to plaintiffs out of the incentive bonus money it received.  The court therefore cannot conclude now, as a matter of law, that these statements made it unreasonable for Matthews, Bruneau, Petros, and Carey to rely on Hancock's statements at the May 2013 meeting.[9]

_____

[9] SAI relies on a number of First Circuit cases in support of its arguments on the reasonableness of the plaintiffs' reliance in the wake of these statements.  See doc. no. 38-1, at 18-19 (citing Sands v. Ridefilm Corp., 212 F.3d 657 (1st Cir. 2000); Steinke v. Sungard Financial Systems, Inc., 121 F.3d 763 (1st Cir. 1997); Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115 (1st Cir. 1995).  Even assuming these cases cannot be distinguished factually from the present case, the court declines to find that they control here.  In each of these cases, the court applied the law or laws of states in which the promissory estoppel doctrine is substantially more developed than it is in New Hampshire.  See Sands, 212 F.3d at 664 (applying Massachusetts law); Steinke, 121 F.3d at 776-77

Finally, SAI contends there is no evidence in the record demonstrating that Hancock's statements actually resulted in any action or forbearance on the part of the plaintiffs.  The court disagrees.  Each of the four plaintiffs present at the May 2013 meeting stated in his deposition and/or affidavit that the availability of incentive bonuses caused the tower crews to hustle more and work harder.  There are also statements to the effect that the plaintiffs strove to become more efficient and to finish towers in less time than it would have taken absent the incentive bonuses.  And at least one of the plaintiffs appears to state that he continued to work for SAI due at least in part to Hancock's statements regarding the incentive bonuses.  In light of these facts, a reasonable jury could conclude that Hancock's statements caused an act or forbearance on the part of Matthews, Bruneau, Petros, and Carey.

The above notwithstanding, the court concludes that SAI is entitled to summary judgment on Count II with respect to Romano.  There is no dispute that Romano was not present at the May 2013

------

(applying Pennsylvania law and discussing Massachusetts law); Coll, 50 F.3d at 1124 (applying Massachusetts law).  Whatever foundational similarities the promissory estoppel doctrines in those states share with that of New Hampshire, the court declines to imply into New Hampshire common law principles or restrictions from other states that have not yet been addressed by the NHSC or the First Circuit when applying New Hampshire law.

meeting and accordingly did not learn about the incentive
program at that time.  He initially learned that an incentive
program existed during his interview with Rossi, but did not
learn that AT&T was the vendor or how the bonuses were going to
be divided until later interactions with Carey.  Moreover,
Romano states in his affidavit that he did not learn of the
amount of bonuses available per site until after his employment
with SAI ended.  Romano Aff. ¶ 10.  He further conceded during
his deposition that he did not rely upon any SAI representations
when deciding to continue working for SAI or to work longer
hours, longer workweeks, or weekends.  See Romano Dep. at 171.
Thus, there is simply no basis in the record to conclude that
SAI ever made any promise to Romano with respect to the
incentive bonuses or that Romano was ever induced into an action
or forbearance by such a promise.  SAI's motion is accordingly
granted as to Romano's promissory estoppel claim.

    In sum, SAI's motion for summary judgment is granted in
part and denied in part as to the plaintiffs' claims for
promissory estoppel.

## III. FLSA

    Under the FLSA, non-exempt employees must ordinarily be
compensated "at a rate not less than one and one-half times the
regular rate at which he is employed" for any hours worked in

excess of forty in a given week. 29 U.S.C. § 207(a)(1). "[T]he 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," subject to certain exceptions. Id. § 207(e).

Here, SAI raises two arguments as to why payments under the incentive bonus plan did not count toward the plaintiffs' regular rate. First, SAI argues that the incentive payments were gifts, excepted from the regular rate by 29 U.S.C. § 207(e)(1). Second, SAI argues that the incentive payments were discretionary bonuses, excepted by 29 U.S.C. § 207(e)(3). The court considers these arguments in reverse order.

"In order for a bonus to qualify for exclusion as a discretionary bonus under [§ 207(e)(3)] the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid." 29 C.F.R. § 778.211(b). "If an employer promises in advance to pay a bonus, he has abandoned his discretion with regard to it." Id. "Bonuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay." Id. § 778.211(c).

Here, there is a genuine dispute of fact as to whether SAI retained discretion regarding both the fact of payment incentive

bonuses to the tower crews and the amount of any such payment.
As discussed above, there is evidence in the record that Hancock
stated the following during the 2013 meeting: (1) that AT&T
would award bonuses of up to $13,000 per site, assuming certain
conditions were met; (2) that the bonuses would be paid at the
end of the year; and (3) that the bonuses were only available to
tower crews.  There is also evidence to suggest that these
bonuses induced members of the tower crews to work harder or
more efficiently, or to remain with SAI.  Based on this
evidence, a reasonable jury could conclude that SAI relinquished
discretion over both the fact these bonuses would be paid to the
plaintiffs and the amount that would be paid.  Thus, the court
cannot conclude as a matter of law that the incentive bonuses
were discretionary.[10]

    SAI is similarly not entitled to summary judgment on the
plaintiffs' FLSA claim on the basis that the incentive bonuses
were gifts under § 207(e)(1).  "To qualify for exclusion under
[this section] the bonus must be actually a gift or in the
nature of a gift."  29 C.F.R. § 778.212(b).  "If it is measured
by hours worked, production, or efficiency, the payment is

---

    [10] Unlike with the promissory estoppel claim, SAI has not
raised any separate argument as to why it is entitled to summary
judgment with respect to Romano on the FLSA claim or the state
wage claim.  The court therefore does not conduct separate
analyses with respect to Romano on these claims.

geared to wages and hours during the bonus period and is no longer to be considered as in the nature of a gift."  Id.

It is undisputed in the record that AT&T paid incentive bonus money to SAI based on certain "drivers," including the quality and the speed of the work on the tower sites.  If SAI did not have discretion to retain some or all of these payments, and instead had to pass them directly on to the tower crews, then these "drivers" determined how much the tower crews would receive in incentive bonuses.  Under such circumstances, the payments would plainly be measured by the tower crews' production and/or efficiency.  There is therefore no basis to conclude now, as a matter of law, that these payments were necessarily gifts.

In sum, SAI's motion for summary judgment is denied as to the plaintiffs' FLSA claim.

## IV.  <u>State Wage Claim</u>

Under RSA § 275:53, an employee may bring an action "to recover unpaid wages and/or liquidated damages . . . in any court of competent jurisdiction . . . ."  "The term 'wages' means compensation . . . for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation."  RSA § 275:42.

24

Relying on its arguments with respect to the plaintiffs'
other claims, SAI contends that the plaintiffs "cannot prove
entitlement to any additional incentive payments."  Doc. no. 38-
1 at 24.  As previously discussed, however, there is a genuine
dispute of fact in the record as to what SAI said to the
plaintiffs with respect to the incentive bonuses.  As SAI
provides no alternative argument as to the plaintiffs' state
wage claim, this claim also survives for the reasons discussed
above.

SAI's motion for summary judgment is accordingly denied as
to plaintiffs' state wage law claim.

## V.    Unjust Enrichment

"Unjust enrichment is an equitable remedy that is available
when an individual receives a benefit which would be
*unconscionable* for him to retain."  Axenics, Inc. v. Turner
Const. Co., 164 N.H. 659, 669 (2013) (internal quotation marks
and citation omitted) (emphasis in original).  "It is not a
boundless doctrine, but is, instead, narrower, more predictable,
and more objectively determined than the implications of the
words unjust enrichment." Id. (internal quotation marks and
citation omitted).  "[U]njust enrichment generally does not form
an independent basis for a cause of action."  Gen. Insulation
Co. v. Eckman Const., 159 N.H. 601, 611 (2010) (citation

omitted).

The plaintiffs' unjust enrichment claim fails as a matter of law.  Courts in this district have repeatedly concluded that recovery under an unjust enrichment theory is not available under New Hampshire law when a plaintiff has an adequate legal remedy.  E. Elec. Corp. v. FERD Const., Inc., No. 05-cv-303-JD, 2005 WL 3447957, at *2 (D.N.H. Dec. 15, 2005) (collecting cases); Parsons Infrastructure & Tech. Grp., Inc. v. Gilbane Bldg. Co., No. 05-cv-01-PB, 2005 WL 2978901, at *1 (D.N.H. Nov. 7, 2005).  The plaintiffs have failed to explain how their wage claims and promissory estoppel claims, which survive for the above-stated reasons, fail to provide them with an adequate legal remedy here.  Cf. Mangiardi Bros. Trucking v. Dewey Envtl., LLC, No. 12-cv-481-JD, 2013 WL 1856338, at *3 (D.N.H. Apr. 30, 2013).  Thus, recovery under an unjust enrichment theory is not available to the plaintiffs in this case.[11]

---

[11] Though courts in this district have referred to promissory estoppel as an "equitable" principle, see, e.g., Derry & Webster, LLC v. Bayview Loan Servicing, LLC, No. 14-cv-211-PB, 2014 WL 7381600, at *7 (D.N.H. Dec. 29, 2014), there does not appear to be any authority from the NHSC, the First Circuit, or any state or federal court in a First Circuit state supporting the conclusion that a claim for promissory estoppel is similarly barred any time there is an adequate legal remedy available.  The only comparable bar to a promissory estoppel claim recognized under New Hampshire law is that the doctrine can only be applied in the absence of an express contract.  See Ruivo v. Wells Fargo Bank, N.A., No. 11-cv-466-PB, 2012 WL 5845452, at *5 (D.N.H. Nov. 19, 2012), aff'd, 766 F.3d 87 (1st

SAI's motion for summary judgment is therefore granted as to plaintiffs' unjust enrichment claim.

### Conclusion

Based on the foregoing, SAI's motion for summary judgment (doc. no. 38) is granted on Count I and Count III as to all plaintiffs and on Count II as to Romano.  The motion is otherwise denied.

SO ORDERED.

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge


June 19, 2017

cc:  Leslie H. Johnson, Esq.
     Peter G. Callaghan, Esq.

---

Cir. 2014) (citing Great Lakes Aircraft Co., Inc. v. City of Claremont, 135 N.H. 270, 290 (1992)).  SAI does not argue that there is any express contract that the plaintiffs can enforce with respect to the incentive bonuses.  In fact, SAI takes the exact opposite position in its argument for summary judgment on the plaintiffs' third-party beneficiary claim.  The promissory estoppel claim is therefore not similarly barred.